C. J. FREED, Appellant, v. D. H. COLLINS, Appellee.

**ASSAULT AND BATTERY:** Aggressor—What Constitutes. The act of the defendant at the outbreak of the war in hurling even one-half of an egg, either in primitive or scrambled condition, at the plaintiff, even under provocation of an epithet to which no gentleman of self-respect is supposed to meekly submit, brands defendant as the aggressor and vindicates plaintiff's claim to damages (in this case $5,000, reduced by the jury to $7.50), especially when defendant lost all possible chance of forgiveness, in law, by immediately advancing with a long-handled shovel which, with the vigor becoming his three score and ten, he planted, at least twice, on that portion of plaintiff's anatomy "which has always been deemed surgically safe."

*Appeal from Webster District Court.*—HON. C. G. LEE, Judge.

MONDAY, MARCH 15, 1915.

ACTION for damages for assault and battery. There was a counterclaim for rent due. There was verdict for the de-

fendant for an amount less than his claim for rent. The plaintiff appeals.—*Affirmed.*

*Healy, Burnquist & Thomas,* for appellee.

*Kenyon, Kelleher, O'Connor & Price,* for appellant.

EVANS, J.—The alleged assault and battery occurred on June 20, 1913. The parties hereto were neighbors and friends. They were both old men, the defendant being in his seventieth year and the plaintiff a few years younger. The defendant was a laboring man and a bachelor. The plaintiff was a retired farmer. The defendant owned two small residences in Fort Dodge side by side. He occupied the basement of one of them as his own home. He rented the other to the plaintiff. The plaintiff caused the replacement of a broken window pane at a cost of $1.20. He deducted the amount from his check in payment of the next installment of rent. But Collins refused to accept the check on the ground that the repair bill was twice as large as it ought to be. So Freed paid the full amount of rent due. At a later time he again deducted the repair bill from his check and again Collins refused to accept the check. Such was the first curling smoke of the final conflagration. On June 20th, the parties met and visited. They separated in the manner hereinafter indicated. The following from the testimony of Collins indicates his point of view:

1. ASSAULT AND BATTERY: aggressor: what constitutes.

"Freed came over about seven o'clock. I offered him a chair and told him to sit down. He said he had come to see about the screen windows. I said I was working hard this week, and Sunday I will put up the screen windows. He didn't find any fault. He got up then and we had a little sociable talk. When he got up I said: 'Mr. Freed, I wish you would settle with me.' He said: 'You son-of-a-bitch, you can sue me and get it if you can.' I had an egg in my left

paw and I was eating the egg and I let it fly at him. He started to come in again, and I had an old shovel setting there that I used to clean up the yard, and he started to come in and I hit him a couple of licks in the butt with the shovel. He was outside when the egg hit him. Then he started over to his house as if he was going to get another drink of whiskey—he was drinking some—and I said: 'Mr. Freed, I don't want to fight anybody, I am too tired.' After he was struck with the egg he started to his house. Then he came right back and told me to come out and fight him, and I told him: 'No, I wasn't able to fight anybody.' I didn't let him come in a second time. When he went to come in I struck him with the shovel. After he called me a son-of-a-bitch, he went out into the other room, and said: 'I have a notion to break your neck.'"

### CROSS-EXAMINATION.

"After I hit him with the egg, he went outdoors, and just as he was going outdoors he said he had a notion to break my neck, and then he turned around and it seems he was going to come in again, and then I got the shovel and gave him a couple of taps on the butt with it. He was just outside of the door when I hit him with the shovel, at the west end of the house. When I hit him with the shovel I was standing at the door inside. The door was open. Whether it was a screen door I couldn't say. I am sure the door stayed open that night. He was two or three feet from me. I was standing right inside the door. He was standing facing me, and he started to go and I reached and hit him two raps on the butt with it. It was a long handled shovel. I hit Mr. Freed with the shovel just as he was starting to go away from me. I waited until he started to go away from me before I hit him. I think I hit him twice. According to his say so I tried to hit him hard. I don't know whether I did or not. It wasn't my purpose to hit him hard. The reason I hit him when he turned away from me was because I didn't want to

hit him any place only on the butt. I didn't want to hurt him nor I wouldn't hurt Charlie Freed again.''

The following from the testimony of Freed will be sufficient to indicate his version of the affair:

''He had no table or chair on that side of the house. At first all he said was he asked me how long I was going to live in the house without paying rent. He said that in a good natured way. I told him I would pay it now. Then I took the check out of my pocketbook; the same check I had showed him two weeks before. Then he throwed an egg at me and got mad. I don't know where he got that egg. I think he had it in his pocket. He said he wasn't going to pay that $1.20 for the window light, it was too much. I didn't know whether he was angry at that time. I was not. Before he threw the egg, I couldn't say that he looked like a man that was going to fight. When he wouldn't pay the $1.20 without another word he threw the egg at me. I took out the check and showed it to him and said 'this is the check,' but he wanted the $1.20 and he didn't take the check. Then he threw the egg at me. What struck me was not half of a soft boiled egg, it was a raw egg. . . . Then he took hold of his spade shortly after he threw the egg. I thought he was angry then, and I stayed right there. After he hit me with the egg, I told him if I owed you anything I am willing to pay it, and now you are taking your own law to me when you are getting after me like that, that is throwing the egg at me. I don't know what Collins said when I said that. I thought he was angry and was taking the law into his own hands. I did not start to go to my own house before he struck me. I stayed right there. It was after he struck me that I said 'if you want to fight we will go out in the street.' I didn't want to fight him on his own place there. That is all I can remember that I said in that conversation. I don't recollect what Collins did when I spoke about going out into the street. . . . When I first stepped out of the house and Collins spoke to

me, I couldn't tell whether he was angry or not. There was no sign of his being angry."

The case has some cartoon features. Each of these parties appears to have had his own eccentricities. There is a note of complaint in the testimony of Freed because Collins made the assault without giving any sign of anger. And Collins testified: "I was not angry with Mr. Freed when I hit him. When he called me a son-of-a-bitch I got angry, I couldn't strike him very hard with half an egg." At one point the issues of their controversy were interrupted by another; and that was the question of where the war zone should be. Collins wanted the fight to be held in the backyard. Freed wanted it in the street in front of the house, because he did not want to fight Collins upon his own premises. This question was never settled. The evidence was sufficient to sustain a finding that Collins was the aggressor and was guilty of assault and battery. Whether it was sufficient to sustain a contrary finding and whether the circumstances indicated should be deemed aggravating or mitigating would be more difficult questions. We need not pass upon these. The jury was evidently inclined to be charitable in judgment to both parties. As hereinafter shown, a small amount was allowed Freed as damages for the assault. As compared with the five thousand dollars claimed in the petition, the amount thus allowed by the verdict was very small. But the amount had support in the evidence. This evidence was direct that Collins was "too tired" to fight and that Freed "didn't want to fight him on his own place there;" and that Collins did not "hit him any place only on the butt."

Collins was the older man. But he was also the smaller and thereby had the advantage of the smaller girth. It is one of the mercies of the Almighty toward old age that He will not furnish it with heart-action and respiration sufficient to finish a fight. If these men had been fifty years younger, we might have had to deal with fatalities. As it is, they have

escaped with a property loss to Collins of "half an egg"; and some consequential damage to Freed from the egg-stain and from a few "black and blue" spots on an area of the body which has always been deemed surgically safe, and which has always borne harmlessly the corporal discipline of all the generations.

It was a circumstance against Collins that his attack was below the generally accepted level. Our best information, *aliunde,* is that the "belt" is the water-line of pugilistic standards. Hostilities delivered below such line are deemed submarine, and are not honored on the field of honor. Whether they are justified under the rules of warfare obtaining between neighbor and neighbor, or between landlord and tenant, we are not at present advised. Collins, being the shorter combatant, may have delivered the assault as high as his stature would permit.

We may safely assume that these circumstances were not overlooked by the jury. The net effect of the verdict would seem to indicate the jury view that though the assaulting maneuvers were not murderous, they ought to have been pitched at a higher plane.

II. The errors of law assigned are all predicated upon instructions given by the court and upon requested instructions refused. These all bear upon the question of liability of the defendant to the plaintiff for the assault and are predicated upon the assumption that no recovery was allowed therefor. Before passing to the consideration of such errors, we must first ascertain from the record whether an allowance of some amount was made by the jury on the plaintiff's cause of action. If yea, then none of the errors complained of could have been prejudicial.

The counterclaim was for two months' rent at $15 per month and for potatoes to the value of $5. The verdict was for the defendant for $21.30. It is undisputed that the defendant was entitled to a rental of $15 per month payable in advance on the 7th day of each month. It is also undisputed

that the monthly rental falling due on June 7th and July 7th
was unpaid except to the extent of $1.20 for the repair of
the window. This situation is met in argument by the sug-
gestion that Freed moved out of the premises before the expi-
ration of thirty days after July 7th. But this fact would not
reduce the amount of rent due on July 7th which was then
$30, less $1.20. Freed was a tenant at will. In order to ren-
der him liable for the rent due on July 7th, it was not neces-
sary that he should continue in possession for thirty days
thereafter. It was a sufficient consideration that he had a
right to do so. Neither party could legally terminate the
tenancy without thirty days notice to the other. If Freed
owed Collins $30 rent on July 7th, he likewise owed it to him
on the subsequent dates. Freed testified that he left the prem-
ises about July 25th. If it were held that his rent could be
apportioned because of his termination of the occupancy be-
fore the expiration of his time, even then he was owing for
18 or 19 days in July, which would put him in arrears not
less than $24. From any point of view, therefore, it is evi-
dent that the jury did allow a recovery to the plaintiff in a
small amount. Under the undisputed evidence, something
was due the defendant for potatoes. Under his evidence, the
amount would be $5. Under Freed's evidence, it would be little
more than $1. It is manifest, therefore, that the jury allowed
upon plaintiff's cause of action not less than $7.50 and not
more than $12.50. Inasmuch as there was a finding of lia-
bility against the defendant for the assault, the alleged errors
in the instructions presented for our consideration were nec-
essarily nonprejudicial. This brings the parties to the end of
the lane. They have demanded all their rights and have re-
ceived them. They have had their full "day in court." Each
has had the best there was to be had in the way of counsel
and other aid. It is not for us to speculate, though we may
involuntarily hope that the final account of expense of these
luxuries may be as moderate as the verdict and as diminutive
as the *casus belli*. We think it providential for both parties

that the litigation must now end. Otherwise, history might repeat itself in another "calf case." In the parlance of diplomacy, the incident will now be deemed closed. The judgment entered below will be—*Affirmed.*

DEEMER, C. J., LADD and PRESTON, JJ., concur.